UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:
JOSE R. DURAN,
    Debtor.                               No. 7-05-12450 SS

The BANK OF LAS VEGAS,
    Plaintiff,

v.

JOSE R. DURAN,
    Defendant                           Adversary No. 05-1140 S

**FINDINGS OF FACT AND CONCLUSIONS**
**OF LAW AFTER TRIAL ON THE MERITS**

This matter came before the Court for trial on the merits of Plaintiff The Bank of Las Vegas' ("Bank's") complaint objecting to the dischargeability of its debt. Plaintiff appeared through its attorney Ben Mondragon. Defendant ("Debtor") appeared through his attorney Daniel J. Behles. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I)[1].

Bank seeks to hold its claim nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (B), (4) and (6). Those sections provide:

>    (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>    ...
>    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

---

[1] All statutory and rule references are to the Bankruptcy Code and Rules before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

>    (A) false pretenses, a false representation, or actual
>    fraud, other than a statement respecting the debtor's
>    or an insider's financial condition;
>    (B) use of a statement in writing--
>    (I) that is materially false;
>    (ii) respecting the debtor's or an insider's financial
>    condition;
>    (iii) on which the creditor to whom the debtor is
>    liable for such money, property, services, or credit
>    reasonably relied; and
>    (iv) that the debtor caused to be made or published
>    with intent to deceive;
>    ...
>    (4) for fraud or defalcation while acting in a
>    fiduciary capacity, embezzlement, or larceny;
>    ...
>    (6) for willful and malicious injury by the debtor to
>    another entity or to the property of another entity[.]

**FINDINGS OF FACT**

1. "Years ago" Debtor's father Jose Duran, Jr. ("Father") and Debtor's uncle Manny Duran were in business as Duran's Used Cars[2] (the "Business") and opened a line of credit ("LOC") with Bank.

---

[2] Throughout these proceedings it has not been clear what exactly "Duran's Used Cars" is. There is conflicting testimony that it was Father's sole proprietorship, a joint venture of Father and Manny, and an entity in which Debtor may have owned a percentage interest. At closing, Bank's attorney stated that even after trial it was unsure whether or not Debtor owned or had owned any part of the Business. Father testified that it was always, and continues to be, his own business. Some confusion may arise from the fact that only Father possesses a motor vehicle dealer's license. When Debtor started buying and selling cars on his own, he "used" his father's license. While the parties probably understood whose inventory and other assets were whose, this understanding is not documented in any evidence before the Court.

Case 05-01140-s    Doc 20    Filed 09/18/06    Entered 09/18/06 11:44:43 Page 2 of 20

2.  William Melton ("Melton") testified at trial on behalf of Bank. He is an Assistant Vice-President and loan officer. He started working for the Bank in July, 2002.

3.  The LOC came up for renewal around May, 2001. Bank understood that Debtor intended to become a part of the Business. There is no evidence before the Court that Bank required any loan documentation from the Business itself at this time. Rather, Bank sought and obtained a Business Plan, a Profit and Loss Statement and a Personal Financial Statement ("PFS") from Debtor as a condition of renewing the Business' LOC.

4.  The Business Plan (Bank Ex. 14), which has no date and is not signed, is reproduced here:

> STATEMENT OF PURPOSE
> BUSINESS PLAN
> FOR
> DURAN'S USED CARS
>
> I, Robert Duran III, dba Duran's Used Cars am seeking a line of credit in the amount of $75,000. This would be used to purchase cars and have enough inventory to successfully operate a used car business. This used car dealership has been in operation for over 40 years originally started by my grandfather, Robert Duran, Sr. then by my father Robert Duran, Jr. and his brother Manny Duran. My family has been doing business with the Bank of Las Vegas for many years. I too would like to be able to successfully operate a used car business. This line of credit should be sufficient to finance this business so it can operate as a viable profitable business.

This Business Plan does not state that Debtor actually is yet in business[3]. Rather, he would like to operate a business. Furthermore, the Business Plan can hardly be called that. It contains no projections or forecasts, lists no assets, and provides no information on which the Bank could rely to extend credit.

5. The Profit and Loss Statement is for the period January, 2001 through April, 2001. It shows sales from the Business of $125,645, but then seems to claim that Debtor had a 40% interest, or sales for him of $50,258. It lists Debtor's expenses of $4,001 and states a net of $46,257. Notably, there is no cost of sales listed, so as a financial statement it is meaningless. Additionally, the inventory figures are obviously the Business' inventory because the total sales are subtracted from this number. It does not show that Debtor owned any inventory at all. There was no evidence presented that the Bank ever inquired further about Debtor's 40% interest or asked for any documentation of it. Furthermore, Bank should have realized at this point that something was not right, because despite its security

---

[3]Debtor convincingly testified that the Bank knew Debtor's motive was to obtain his own LOC so he could buy cars and sell them from the Business lot under his father's dealer's license, and that Bank understood he had no ownership interest in the Business.

Page -4-

interests, it had not been paid on $125,645 of sales. The Court finds that Bank did not rely on this statement[4].

6. Debtor's PFS lists his residential lot ("Lots 14-16") as worth $40,000 with no mortgage against it. It also states that he has only a 50% interest in the property, or personal equity of $20,000. It lists no value of his business, no value of his ownership interest in the Business, no inventory, and no business assets, equipment or fixtures. He lists his occupation as "Manager, Duran's Used Cars." The PFS lists no debt, although it discloses a monthly payment of $524.01 for a mobile home purchase. It is unsigned. The PFS is incomplete on its face. Bank offered no proof and did not argue at trial that any entry on the PFS was inaccurate at the time it was executed. Furthermore, the Court finds that Bank did not rely on the PFS[5].

7. On June 8, 2001, Debtor and Father, the co-owner of Lots 14-16, executed a mortgage in the amount of $75,000 to Bank, secured by Lots 14-16. Melton testified that this mortgage

---

[4]Debtor convincingly testified that he sat down with a Secretary at the Bank and she prepared this document. He was unaware that she listed a 40% business interest; his agreement with Father was to share proceeds from his car sales on a car by car basis.

[5]Debtor convincingly testified that he sat down with a Secretary at the Bank and she prepared this document.

Page -5-

was additional collateral for the LOC. This property is the same property that Debtor identified on his PFS as having a value of $40,000 weeks earlier.

8. Melton testified that Bank believed Debtor and Father co-owned the Business. There are no documents in evidence that Debtor ever owned any share of the business. Father testified that if Debtor had told Bank he owned 40% of the business he was lying. However, Melton also testified that the Bank file said there was a positive banking relationship and that the Bank intended to help Debtor take over the business. Bank knew that Debtor did not have a motor vehicle dealer's license. According to Debtor, Bank also knew that he had no property of any value.

9. Also on June 8, 2001, Bank did an "annual renewal" of the LOC, extending it to June 8, 2002. The Commercial Security Agreement listed the borrowers as Debtor d/b/a Duran's Used Cars and Father. The primary purpose of the loan was designated "Business." The face amount of the LOC was $75,000. The collateral was Business' inventory. The loan was signed by both borrowers "Individually."

10. On June 20, 2001, Bank filed a UCC-1 Financing Statement in the names of "Duran's Used Cars; Robert Duran III; Robert Duran Jr." It covered "all used cars in borrower's place of business (Duran's Used Cars; 900 East Prince; Las Vegas, NM)

Case 05-01140-s    Doc 20    Filed 09/18/06    Entered 09/18/06 11:44:43 Page 6 of 20

together with all related equipment now owned or hereafter acquired." It was signed by Duran's Used Cars, "by" Father, and by Debtor, individually.

11. In 2003, Debtor's 2002 income tax returns became due. Bank Exhibit 11 is an unsigned, undated copy of the Debtor's federal tax return. The first page of Schedule C, income from self-employment, is missing. Bank did not explain this omission, although Melton testified that he had seen it at some point. Overall, the return shows gross income of $34,401 and total tax liability of $8,202. This left net spendable income of $26,199. It also shows, on page 2 of Schedule C, that there was no beginning or ending inventory for Debtor's business.

12. Melton did not testify when the Bank actually received this tax return, but did testify that Bank relied on it to extend credit. He did not testify for which loan renewal this return was relied on; the only bank transactions after this point reduced the LOC. The Court finds that it was unreasonable to rely on this tax return, if the Bank actually did so, because it is undated and unsigned and shows little income from which to repay a $65,000 loan.

13. Melton became involved with the LOC account in June or July, 2003.

14. On June 27, 2003, Father executed a Quit-claim Deed to Debtor for Lots 14-16. The copy in evidence does not show it was ever recorded.

15. On July 2, 2003, Father and Debtor jointly executed a Warranty Deed to Debtor for Lots 14-16. The deed was filed for record on July 2, 2003. This fact does not impact on Bank's security.

16. Bank Exhibit 22 is a loan history for the July 2003 LOC renewal. It shows a series of draws and repayments, with the balance starting at $58,585 and ending at $64,584, when it was renewed by a July 20, 2004 note. The printout shows a draw on September 18, 2003 which Bank claims was for a 2000 Ford Pickup ("Ford").

17. Father testified that he and Debtor purchased the Ford on September 25, 2003. He borrowed $12,940 personally from the Bank (Debtor Exhibit 7). The loan documents state the purpose of Father's loan was to purchase autos for resale. Father testified that he combined his $12,940 with $5,000 from Debtor to fund the purchase[6]. Somehow, sometime, the Ford's title was presented to the Bank as additional collateral. Father obtained a duplicate title to the Ford in June, 2004, and sold it at a Colorado auction. He

---

[6]The loan history, Bank exhibit 22, shows a $5,200 draw about this time.

Page -8-

received net proceeds of $18,290. Father used the funds to pay off his note to Bank for $13,181.96 and put the rest of the money in Debtor's checking account. The Court cannot find from the evidence that the amount deposited in Debtor's checking account was ever repaid to the Bank. <u>See also</u> Bank Exhibit 22 (only $1,320 credited to LOC from June to August 2004).

18. Exhibit B is the title for the Ford. Bank claims it advanced $11,295 for its purchase on September 12, 2003. The Court does not believe this version of events, finding Father's documentation more credible. The LOC was repeatedly paid down after this time, but Bank was unable to identify any deposit corresponding to the Ford so claims it was not paid on this vehicle.

19. On July 2, 2004, Debtor <u>alone</u> signed a promissory note (Bank Exhibit 1) to Bank in the amount of $65,175, payable at 9% interest, payable $600[7] per month for 11 months with a final payment of about $64,468.71 due August 4, 2005. It lists Lots 14-16 and the UCC-1 assets as collateral. This note was a continuation of the LOC. Attached to the note is the "Committee Sheet/Loan Approval" documents from the Bank file. While mostly incomplete, this sheet lists total

---

[7] Debtor testified that he told Bank he could only afford $300 payments, but Bank insisted on the $600. Shortly thereafter, Bank called the loan.

Page -9-

collateral value securing the note at $60,000[8]. The "Primary Source of Repayment" is stated as "Business/Income." The Committee comments were "Loan in Excess of Supervisory LTV. Very long banking relationship."

20. Melton testified that at this renewal Debtor asked to become the "proprietor" and Father asked to be released from the LOC. The Bank complied with both requests because there was a good banking relationship.

21. Melton also testified that at the 2004 renewal Bank knew that the Business had cash flow problems[9], which is why the Bank set the note up for monthly payments. Bank also visited the used car lot and noticed a shortage of vehicles, which is why it lowered the LOC from $75,000 to $65,000. "The information didn't fit," according to Melton.

22. Melton testified that Bank obtained no documents to renew the loan in 2004. There was no other evidence presented that Bank obtained any information on either Debtor's personal financial condition or the Business' financial condition at any time since the June 2001 renewal (except, obviously, Debtor's 2002 tax return). Melton did not know why Bank had not asked for more current information, and

---

[8]This demonstrates that the loan committee knew that the value of Lots 14-16 plus all Business inventory was only $60,000.

[9]The record is silent how Bank knew this.

Page -10-

admitted there was no reason to rely on statements over 2 years old.  He also admitted it would not be reasonable to rely on 2 year old documents, and admitted that the long-standing banking relationship was enough to renew the loan.

23. Bank Exhibits 12 and 23 are likewise of no help.  They purport to be the Business' inventory levels.  However, they are undated and there was no testimony presented as to who prepared these listings or for what purpose.  Bank did not tie these documents to any extension or renewal of credit.  Bank's attorney conceded at closing argument that Bank did not call upon the Business for regular periodic inventory levels.

24. Bank exhibits 20 and 21 merely show that Debtor obtained commercial insurance in his name for the period 6/20/2000 to 6/20/2002.  They prove nothing.

25. At trial, Debtor admitted to using some of the LOC for personal expenses.  However, he convincingly testified that the advances on the LOC were generally used for inventory, to pay for "bad business decisions", repairs, and general business expenses.  Bank presented no evidence on the amount of draws used for personal purposes, but urges that the Court declare the entire balance nondischargeable anyway.

26. Debtor filed a voluntary chapter 7 proceeding on March 30, 2005.

Case 05-01140-s    Doc 20    Filed 09/18/06    Entered 09/18/06 11:44:43 Page 11 of 20

27. Bank timely filed this adversary proceeding to determine dischargeability of debt.

28. Debtor testified at the first meeting of creditors that Lots 14-16 were now worth $15,000 to $25,000. Bank presented no evidence at trial that the $40,000 listed in the PFS in 2001 was inaccurate at the time.

29. Bank Exhibit 13 is Debtor's credit report as of May, 2005. The Court finds this exhibit irrelevant.

30. At the time of trial in this case, Father had closed the Business but still had 3 cars in inventory. Father testified that the Business was his and his brother's, and that Debtor's business was a separate business of buying and selling his own cars "under our license."

31. At the time of trial of this case, Bank had not foreclosed on any of its collateral. Melton testified that without foreclosing, and without knowing the current inventory levels of the Business, the Bank did not know its damages or how to calculate them. Melton testified that Bank had 3 titles at the time of trial, one was the Ford, and the other 2 vehicles were still on the lot.

32. Overall, the Court found the Debtor to be credible. The Court also finds that Debtor is financially unsophisticated and did not understand the import of the documents he was preparing or having prepared in his name. The Court finds

that he did not adopt the Profit and Loss Statement as his own, nor did he adopt the PFS, both of which were prepared by the Bank. At trial, Debtor seemed surprised of the content of those documents and their meanings.

33. The Court found Melton to be credible, but his knowledge of what transpired before he took over the loan file in 2003 is not as persuasive as Debtor's and Father's versions of the events.

34. The Court assumes that there were other times that Debtor may have made representations to the Bank about the Business, but Bank has not come forward with details of those representations.

**CONCLUSIONS OF LAW**

"[E]xceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." <u>Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)</u>, 125 F.3d 1358, 1361 (10th Cir. 1997). The Creditor must prove its case by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 654, 661 (1991).

**Section 523(a)(2)(A)**

A claim will not be dischargeable under this subsection "if the following elements are proven: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on that

representation; (4) the creditor's reliance as [justifiable][10]; (5) the debtor's representation caused the creditor to sustain a loss." Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir.1996).

This claim will be dismissed. The Bank did not prove there were misrepresentations. The Bank did not prove the Debtor intended to deceive it. The Court finds that Bank did not rely on the representations it introduced into evidence, but rather relied on a long term family banking relationship to extend and renew credit. The Bank's reliance, if any, was not justifiable under the circumstances because both the documents before it were deficient and also even a cursory followup would have revealed facts such as Debtor had no interest in the Business and had virtually no property and little income.

**Section 523(a)(2)(B)**

---

[10] The Fowler Bros. Court used the term "reasonable" reliance, but the Supreme Court has held that § 523(a)(2)(A) requires only justifiable, and not reasonable, reliance in the case of Field v. Mans, 516 U.S. 59, 74 (1995). This Court has applied that standard rather than the reasonable reliance standard articulated in Fowler Bros. v. Young. In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent. Field v. Mans, 516 U.S. 59, 71 (1995). Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover. Id. at 72.

Page -14-

Case 05-01140-s    Doc 20    Filed 09/18/06    Entered 09/18/06 11:44:43 Page 14 of 20

Under § 523(a)(2)(B), Bank's burden of proof was to establish that the Debtor used a "statement in writing" (1) that is materially false; (2) respecting his financial condition; (3) on which the creditor reasonably relied; and (4) which the Debtor caused to be made or published with the intent to deceive. <u>Bellco First Federal Credit Union v. Kaspar (In re Kaspar)</u>, 125 F.3d 1358, 1359 (10th Cir. 1997). To come within the exception of § 523(a)(2)(B), the statement, to be "in writing," must either have been written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor. <u>Id.</u> at 1361. The requirement of a writing is a basic precondition to nondischargeability under section 523(a)(2)(B). <u>Id.</u>

This claim will be dismissed. The Bank did not prove Debtor adopted the Profit and Loss Statement or the PFS. The Court finds to the contrary: Debtor did not adopt these documents and was surprised by their content when he saw them. Neither were signed. There is no evidence he even saw them at the time they were prepared. Secondly, Bank did not prove that any of these statements were false at the time they were composed. It is possible that, under the sharing of profits agreement that the Debtor had in 2001, he did have 40% of the sales from the lot in early 2001. The Court finds that the Bank did not reasonably rely on these writings in 2001 or at any later time in extending or renewing credit. Even Bank admitted it was not reasonable to

Page -15-

rely on documents over two years old when renewing the LOC. Finally, the Court finds that Debtor did not intend to deceive the Bank.

**Section 523(a)(4) - fiduciary capacity**

Under Section 523(a)(4), Bank's burden of proof was to establish: (1) a fiduciary relationship existed between the Debtor and Bank, and (2) fraud or defalcation was committed by the Debtor in the course of that fiduciary relationship. <u>Fowler Bros.</u>, 91 F.3d at 1371.

> Whether there is a fiduciary relationship between Defendant and Plaintiff is a threshold issue to the determination of dischargeability under 11 U.S.C. § 523(a)(4). <u>Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)</u>, 216 B.R. 283, 286 (10th Cir. BAP 1997); <u>In re Neal</u>, 324 B.R. 365, 370 (Bankr. W.D. Okla.2005) (citation omitted). The fiduciary duty contemplated by 11 U.S.C. § 523(a)(4) is very narrow. See <u>Holaday v. Seay (In re Seay)</u>, 215 B.R. 780, 786 (10th Cir. BAP 1997) (noting that the Tenth Circuit in <u>Fowler Bros. v. Young (In re Young)</u>, 91 F.3d 1367 (10th Cir.1996) interpreted the phrase "fiduciary capacity" narrowly.); <u>In re Neal</u>, 324 B.R. 365, 370 (Bankr. W.D. Okla.2005) ("The Tenth Circuit has taken a very narrow view of the concept of fiduciary duty under this section."). Whether a fiduciary duty within the meaning of 11 U.S.C. § 523(a)(4) exists is a question of federal law, but state law is relevant to the determination of whether a trust relationship exists. <u>Storie</u>, 216 B.R. at 286; <u>Young</u>, 91 F.3d at 1371. Fiduciary duty within the meaning of 11 U.S.C. § 523(a)(4) is present only when there is an express or technical trust. See <u>Allen v. Romero</u>, 535 F.2d at 621 ("[T]he exception under § 17(a)(4) [the predecessor under the former Bankruptcy Act to § 523(a)(4) ] applies only to technical trusts and not those which the law implies from a contract.") (citation omitted). "Trusts imposed by state statutes are technical trusts, which may lead to the existence of a fiduciary relationship." <u>Neal</u>, 324 B.R. at 370. <u>See also</u>, <u>In</u>

re Woods, 284 B.R. 282, 288 (D.Colo.2001) (noting that "[a] technical trust may arise as a result of defined obligations imposed upon the debtor by state or federal statute.") (citing Allen v. Romero, 535 F.2d at 622). However, "[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability." Young, 91 F.3d at 1372 (citations omitted).

Foxworth Galbraith Lumber Co., Inc. v. Manelos (In re Manelos), 337 B.R. 409, 412-13 (Bankr. D. N.M. 2006).

The Court finds no fiduciary duty in this case. The Bank's relationship with the Debtor was simply Debtor/Creditor. Bank had a lien on property, it was not the beneficiary of any trust. Even if New Mexico state law imposed some sort of fiduciary duty on licensed motor vehicle dealers, Debtor was not a licensed motor vehicle dealer, and Bank knew this.

**Section 523(a)(4) - embezzlement**

Klemens v. Wallace (In re Wallace), 840 F.2d 762, 765 (10th Cir. 1988), defines embezzlement under federal common law for purposes of Section 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. See also Rech v. Burgess (In re Burgess), 106 B.R. 612, 621 (Bankr. D. Neb. 1989)(Same.)

The only items of property at issue is the Ford. This will be dealt with under Section 523(a)(6) below.

**Section 523(a)(4) - larceny**

Page -17-

Larceny is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner. As distinguished from embezzlement, the original taking of the property was unlawful. 4 Resnick, Sommer and King, Collier on Bankruptcy, ¶ 523.10[2] at 523-76 (15th ed. Revised). Larceny is distinguished from embezzlement only as to the original taking and possession of property being unlawful rather than authorized. Id. See also Burgess, 106 B.R. at 622.

The only items of property at issue is the Ford. This will be dealt with under Section 523(a)(6) below.

**Section 523(a)(6)**

> The Supreme Court has explained that this statute refers only to "acts done with the actual intent to cause injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Non-dischargeability under § 523(a)(6) requires proof of two elements-that the injury is both willful and malicious. Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129 (10th Cir.2004)(holding that there must be proof of both a "willful act" and "malicious injury" to establish nondischargeability under § 523(a)(6)); see also Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley), 235 B.R. 651, 655 (10th Cir. BAP 1999) (collecting opinions interpreting § 523(a)(6)). A "willful act" is one in which the debtor must " 'desire ⋯ [to cause] the consequences of his act or ⋯ believe [that] the consequences are substantially certain to result from it.' " Moore, 357 F.3d at 1129 (quoting Longley, 235 B.R. at 657). A malicious injury occurs when there is proof that the debtor either intended the resulting injury or intentionally took action that was substantially certain to cause the injury. Id. The test for this element is a subjective one: the court must determine what the debtor knew or intended with respect to the consequences of his actions. Id.

Page -18-

Case 05-01140-s    Doc 20    Filed 09/18/06    Entered 09/18/06 11:44:43 Page 18 of 20

McCain Foods USA Inc. V. Shore (In re Shore) 317 B.R. 536, 542 (10th Cir. BAP 2004).

The Court finds that Debtor's act of obtaining a duplicate registration and selling the Ford constitutes and willful and malicious conversion of Bank's property. The Court finds that once Bank established it had a lien on the Ford and advanced money for that Ford, it had the right to be repaid from the Ford. The Court also finds that once Bank established these facts, the burden of proof shifted to Debtor to show that the Bank had been repaid. Debtor did meet this burden of proof. Therefore, the Court finds that the $5,200 advanced on the LOC for the purchase of the Ford is nondischargeable in this proceeding.

**CONCLUSION**

For the reasons set forth above, the Court dismisses the Bank's claims under 11 U.S.C. §§ 523(a)(2)(A), (B), and (4). The Court awards Bank judgment on its claim under 11 U.S.C. § 523(a)(6) in the amount of $5,200. A separate judgment will enter.

_____
Honorable James S. Starzynski
United States Bankruptcy Judge

copies to:

Ben Mondragon
1920 7th St
Las Vegas, NM 87701-4956

Daniel J Behles
226-A Cynthia Loop NW
Albuquerque, NM 87114-1100